# EXHIBIT B

**Affidavit of James F. Wilson**
**Court File No. 11-CV-1318 DSD/JSM**

AGREEMENT BETWEEN

NORTH CENTRAL STATES REGIONAL COUNCIL OF CARPENTERS

and

CARPENTRY CONTRACTORS ASSOCIATION

and

MINNESOTA DRYWALL AND PLASTER ASSOCIATION

ALL WAGE AREAS
2010, 2011, 2012

(Expires April 30, 2013)






## Table of Contents
## *CCA – MDPA*

ARTICLE 1 - Considerations for Agreement ........................................................................ 1

ARTICLE 2 – Designation of Parties..................................................................................... 1

ARTICLE 3 - Union Recogition ............................................................................................. 2

ARTICLE 4 – Scope of Agreement and Territorial Jurisdiction........................................... 2

ARTICLE 5 – Union Security................................................................................................. 3

ARTICLE 6 – Referral............................................................................................................ 4

ARTICLE 7 – Grievances, Disputes and Arbitration ........................................................... 5

ARTICLE 8 - Management...................................................................................................... 6

ARTICLE 9 - Safety ............................................................................................................... 6

ARTICLE 10 - Pickets, Banners, Strikes, Lockouts, and Work Interference ....................... 6

ARTICLE 11 – Subcontractor Clause .................................................................................... 6

ARTICLE 12 – Union Representatives and Stewards............................................................. 9

ARTICLE 13 – Payroll Records............................................................................................. 9

ARTICLE 14 – Pay Day, Wage Payment and Call In Pay ..................................................... 9

ARTICLE 15 – Fringe Benefits ........................................................................................... 10

ARTICLE 16 – Savings Clause............................................................................................ 13

ARTICLE 17 – Duration Dates ............................................................................................ 13

ARTICLE 18 - Wages........................................................................................................... 13

ARTICLE 19 – Travel Outside District – Area A1 Only ...................................................... 18

ARTICLE 20 - Parking ......................................................................................................... 19

ARTICLE 21 – Work Break.................................................................................................. 19

ARTICLE 22 - Hours ............................................................................................................ 19

ARTICLE 23 - Tools............................................................................................................. 20

ARTICLE 24 – Training Fund, Apprenticeship and Pre-Apprentices ................................ 21

ARTICLE 25 – Work Dues................................................................................................... 22

ARTICLE 26 – CCA/MDPA Industry Funds....................................................................... 22

ARTICLE 27 – Labor Management ...................................................................................... 22

## AGREEMENT BETWEEN
## NORTH CENTRAL STATES REGIONAL COUNCIL OF CARPENTERS
### and
## CARPENTRY CONTRACTORS ASSOCIATION
### and
## MINNESOTA DRYWALL AND PLASTER ASSOCIATION
## 2010, 2011, 2012
## (Expires April 30, 2013)

### ARTICLE 1 – Considerations for Agreement

In consideration of the mutual promises of the parties and their mutual purposes to establish, maintain and promote sound harmonious labor relations, this Agreement is made this 1st day of May 2010 by and between the Carpentry Contractors Association and the Minnesota Drywall and Plaster Association (formerly the Gypsum Drywall Contractors Association) on behalf of all contractors signatory to this Agreement, hereinafter known as the "CCA" and "MDPA" or "Employers" and the North Central States Regional Council of Carpenters, representing Carpenters and Pile Drivers, hereinafter known as the "Council", for the purposes of establishing rates of pay, hours of employment and other terms and provisions concerning employment relations and collective bargaining, and represents the entire understanding between the aforesaid parties.

### ARTICLE 2 – Designation of Parties

The Carpentry Contractors Association (CCA) and Minnesota Drywall and Plaster Association (MDPA) are comprised of specialty contractors, general contractors and residential contractors; all of which employ union carpenters. The CCA and MDPA shall represent signatory contractors for all purposes regarding this Agreement. The North Central States Regional Council of Carpenters affiliated with the United Brotherhood of Carpenters & Joiners of America shall represent all Carpenters and Pile Drivers and their Apprentices for all purposes regarding this Agreement.

The Union recognizes the **Carpentry Contractors Association and the Minnesota Drywall and Plaster Association (collectively, the "Associations")** as the bargaining agent for each Employer who has so authorized the Associations to bargain on its behalf for all work performed under this Agreement. The Associations agree to furnish to the Union a list of such Employers upon request. Upon such authorization, the Employer shall become a member of the multi-employer bargaining unit here involved and thereby a party to the Agreement of which the Employer will receive a copy. Individual Employers who have not so authorized the Associations shall, by becoming party to this Agreement, also become part of said multi-employer bargaining unit, and said Employer authorizes Associations to negotiate successor agreements to this Agreement on its behalf. The Employer adopts all provisions of any successor agreements entered into between the Associations and the Union. The Employer may withdraw from the multi-employer bargaining unit only if the Employer submits written notice of its withdrawal to the Association and the Union in writing at least sixty (60) but not more than ninety (90) days prior to the date of this agreement or of any renewal date hereof. Notice to the Associations shall constitute notice to each and all members of the multi-employer bargaining unit. The CCA shall represent all Employers signatory to this Agreement unless the Employer has elected, in writing to be represented by the MDPA.

The Employers agree not to enter into any labor agreements covering construction work, exclusive of maintenance and repair shops, with their employees on whose behalf any of the Unions have granted recognition hereunder individually or collectively which in any way conflicts with the terms and provisions of this Agreement. If the Union enters into any Agreement with any individual Employer or group of Employers competing in the same type of work as defined in this Agreement, which provides for different wages, hours or conditions than as herein specified, the parties may open this Agreement for the express and exclusive purpose of negotiating those different wages, hours or concessions.

## ARTICLE 3 - Union Recognition

The said Council is hereby voluntarily recognized hereunder by the Employers as the exclusive representative of said employees within said collective bargaining unit. Said Union so recognized hereby agrees that it and the International Union with which it is affiliated are qualified for recognition by the National Labor Relations Board in accordance with the Labor Management Relations Act (LMRA) of 1947, as amended.

## ARTICLE 4 – Scope of Agreement and Territorial Jurisdiction

This Agreement shall cover work traditionally performed by the Employers and assigned to employees under this Agreement or predecessor Agreements, anywhere within the geographical jurisdiction of this Agreement.

This Agreement shall cover all the State of Minnesota south of the north lines of Traverse, Grant, Douglas, Todd, Morrison, Mille Lacs, Kanabec and Pine counties. It shall also include the following territory in Wisconsin east of the St. Croix River; Highway 70 to Grantsburg, Wisconsin, then Highway 87 to the intersection of Highway 48, then Highway 48 to the intersection of Highway 35, then Highway 35 to the intersection of Highway 8, then U.S. Highway 8 to the intersection of Highway 65 to River Falls, then Highway 29 to Prescott and across to Hastings. Any city or village located in this line in Wisconsin shall be in the jurisdiction of the North Central States Regional Council of Carpenters.

There are wage packages within this contract, basically along county lines, however where cities or towns fall on county lines, the city limits are usually in more than one county. These cities or town are referenced separately at the end of this Article under the heading "Cities or Towns on Boundary lines."

### AREA A shall have two wage packages, A-1 and A-2

Area A-1 shall consist of Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Kanabec, Pine, Ramsey, Scott, Sherburne, Washington and Wright counties in Minnesota and the territory in Wisconsin described above in this article.

EXCEPTION: In Sherburne County, the portion extending 5 miles beyond the city limits of St. Cloud shall be in Wage Area C-1.

Area A-2 shall consist of Meeker and McLeod counties and the city limits of Red Wing and extending 5 miles outward.

### AREA B shall have one wage package, B-1

Area B-1 shall consist of Olmsted, Goodhue (See A-2 for the City of Red Wing), Wabasha, Dodge, Winona, Fillmore and Houston counties.

### AREA C shall have two wage packages, C-1 and C-2

Area C-1 consists of Mower, Morrison, Mille Lacs, Stearns, Benton, and in Sherburne County the portion extending 5 miles beyond the city limits of St. Cloud, Le Sueur, Rice, Blue Earth, Waseca, Steele, Faribault and Freeborn counties, and the portions of Sibley and Nicollet counties east of the following roads; starting at Highway 22 on the northern Sibley County line and proceeding south to the town of New Sweden in Nicollet County, and then continuing south on Highway 111 to the town of Nicollet and then continuing south on #23 to the south line of Nicollet County.

Area C-2 consists of Traverse, Grant, Douglas, Todd, Pope, Stevens, Big Stone, Swift, Kandiyohi, Chippewa, Lac Qui Parle, Yellow Medicine, Renville, Lincoln, Lyon, Redwood, Brown, Pipestone, Murray, Cottonwood, Watonwan, Rock, Noble, Jackson and Martin counties, and the portions of Sibley and Nicollet counties, west of the following roads shall be in Wage Area C-2, starting at Highway 22 on the northern Sibley County line and proceeding south to the town of New Sweden in Nicollet County, and then continuing south on Highway 111 to the town of Nicollet and then continuing south on Highway #23 to the south line of Nicollet County.

Note: Extending 5 miles beyond the town or city limits of New Auburn, Gaylord, New Sweden and Nicollet shall be in Wage Area C-2.

### CITIES OR TOWN ON BOUNDARY LINES

Each city or town listed below falls on or adjacent to boundary lines, where there would normally be a wage rate difference. There will be one wage rate as shown below for each city or town, which will extend 5 miles beyond the city limits or town boundary

| Belle Plaine | Wage Area A-1 | (Carver, Scott & Sibley counties) |
| Princeton | Wage Area A-1 | (Sherburne & Mille Lacs counties) |
| Eden Valley | Wage Area A-2 | (Stearns & Meeker counties) |
| Red Wing | Wage Area A-2 | (Goodhue & Dakota counties) |
| Cannon Falls | Wage Area B-1 | (Goodhue & Dakota counties) |
| Clearwater | Wage Area C-1 | (Sherburne, Wright & Stearns counties) |
| Brooten | Wage Area C-1 | (Sherburne, Stearns & Benton counties) |
| St. Cloud | Wage Area C-1 | (Stearns, Benton & Sherburne counties) |
| Motley | Wage Area C-1 | (Todd, Morrison & Cass counties) |
| New Prague | Wage Area C-1 | (Scott, Le Sueur & Rice counties) |
| Northfield | Wage Area C-1 | (Rice and Dakota counties) |
| Hazelwood | Wage Area C-1 | (Rice & Dakota counties) |
| New Auburn and Gaylord | Wage Area C-2 | (Sibley County) |
| New Sweden and Nicollet | Wage Area C-2 | (Nicollet County) |

### ARTICLE 5 – Union Security

There shall be no discrimination against any employee because of race, color, creed, political, religious beliefs, sex, disability, national origin, marital status or age.

The Employer shall not discriminate against any employee, as long as the employee is performing work assigned in a safe, normal and workmanlike manner.

Each of the Unions recognized under Article 3 of this Agreement shall be entitled to union security, to the extent that each employee in the collective bargaining unit represented by such union shall be required to become and remain a member of such union in good standing as a

condition of employment from and after the eighth (8th) day after the latest of the following events. "In good standing", for the purposes of this Agreement is defined to mean the payment of a standard initiation fee and standard regular monthly dues, uniformly required as a condition of acquiring or retaining membership in the Union.

1)   The beginning of employment with such employer
2)   The effective date of this Agreement

The Employer shall dismiss each employee who fails to comply with this Union Security provision, provided that:

1)   The employee was requested to join the Union by an authorized representative of the Union; and
2)   Such dismissal shall not be required until a responsible representative of the Employer on the job has been furnished a written notification by an authorized representative of the Union so to do.

The written notification shall state:

(Name of Employee) began employment more than eight (8) days prior to the date below. More than eight (8) days have elapsed since this employee began employment. This employee was requested to join the Union by an authorized representative of the Union. This employee has refused to tender to the Union the current dues and initiation fees uniformly required of members of the Union. Under the provisions of Article 5, we demand that this employee be discharged from your employ.

Authorized Signature _____
Union _____
Date _____

## ARTICLE 6 – Referral

The Union and employers agree to this referral article in order to efficiently dispatch and utilize labor based on the skills and experience needed by the employers. The employers reserve the right to refuse any referral. This is not an exclusive hiring hall. Employers may hire past employees.

(a)   The Employer shall notify the Union of opportunities for employment, and shall provide the Union the opportunity to refer qualified applicants.

(b)   The Employer shall be the sole judge of and have the right to determine the number of employees required on any job, or any portion of the work being done by the Employer.

(c)   Neither the Union nor the Employer shall discriminate in the referring or hiring of employees because of age, race, color, religion, sex, or national origin.

(d)   The Union agrees to furnish qualified journeypersons, apprentices, and pre-apprentices on a non-discriminatory basis as required by the Employer within twenty-four (24) hours, excluding Saturdays, Sundays, and Holiday, after notice by the Employer.

(e)   If the Union fails to furnish qualified journeypersons, apprentices, and pre-apprentices as required, the Employer may draw from whatever sources are available to meet the requirements at the time.

(f)     Contractors have freedom of movement of employees covered by this Agreement throughout the geographical area of this Agreement.

(g)     An employee referred shall be paid not less than the applicable rate in the area to which the employee has been referred for work.

## ARTICLE 7 – Grievances, Disputes and Arbitration

A.      There shall be established a Joint Trade Board, which shall have charge of the enforcement and interpretation of the working agreement, as well as duties specifically mentioned herein.

B.      Each grievance shall be deemed to be waived unless submitted in writing to the parties for resolution within ten (10) days after the event giving rise to the grievance occurs. A copy thereof shall be sent to the Association. The parties to a dispute shall endeavor to resolve the dispute prior to a meeting of the Joint Trade Board. If the parties are unable to resolve the dispute, the Joint Trade Board shall meet to settle the dispute. They shall meet no less than thirty (30) days after any written notice of a grievance to settle a dispute. The parties to a dispute shall be notified no less than 14 calendar days prior to a meeting of the Board. The parties to a dispute may mutually agree to waive any or all of the deadlines contained in this paragraph.

C.      The Union and the Employers shall elect or appoint three (3) members each, and such members shall serve until their successors have been appointed. The Joint Trade Board shall elect a Chairperson and a Secretary from the committee. The duties of the Chairperson shall be to conduct all meetings of the committee. The duties of the Secretary shall be to keep a complete record of the minutes of meetings and correspondence, and shall notify Board members of any special meeting called by the Union and/or contractors. The Secretary shall furnish each member with a legible copy of all minutes and correspondence. The Board may unanimously agree to appoint a third-party Facilitator to carry out the notetaking or meeting-chair duties of either or both of the officers under the direction of the Board. The Facilitator may be present in board deliberations but shall have no voting power on issues that come before the Board. The Facilitator is subject to removal at any time by any member of the Joint Trade Board.

D.      Decisions or orders of the Joint Trade Board shall be signed by the Chairperson or Secretary and distributed to the parties to the dispute. Such decisions and orders shall be final and binding.

E.      If the Joint Trade Board is unable to arrive at a mutually agreeable solution to a problem brought before it, or otherwise unanimously agrees, it may select a neutral arbitrator to hear the case and issue a decision, which shall be final and binding on all parties involved. The neutral arbitrator shall be selected by the Joint Trade Board. In the event the Joint Trade Board is unable to agree on a neutral arbitrator within ten (10) days, the arbitrator shall be selected by and under the rules of the Federal Mediation Service. The decision of the arbitrator shall be final and binding on signatories to the Agreement who are parties to the dispute; provided, however, that the arbitrator shall have no power to add, delete or modify any provisions of this Agreement. Each party shall pay the fees and costs of its own representatives and witnesses. The costs and fees of the neutral arbitrator shall be equally divided between the parties. This article shall not be applicable to jurisdictional disputes nor to the non-payment of wages or fringes, except that this article shall apply to wage disputes.

## ARTICLE 8 - Management

A. Management reserves the right to manage its jobs to the best interest of Management; the right to retain or dispense with employees for cause; to reduce or increase the number of employees needed on each project, crew, activity or piece of equipment.

B. Management has the right to determine reasonable employment qualifications of employees and may discharge any employee whose work is unsatisfactory, or who fails to observe reasonable regulations or safety precautions prescribed by the Employer or any government agency. The employee shall use any tools, equipment, machinery, new material and products or procedures of the employee's craft required by the Employer.

C. There shall be no limit on production of employees nor restriction on the full use of proper tools or equipment and there shall not be any task or piece work.

D. When a new material to be installed replaces a material presently installed by Carpenters, the Employers shall make a specific assignment according to their best judgment.

## ARTICLE 9 - Safety

A. The employees covered by the terms of the Agreement shall, at all times, while in the employ of the Employer be bound by the safety rules and regulations as established by Federal and State safety laws.

B. Where OSHA standards require protective equipment, this equipment shall be made available at the cost of the Employer as determined by OSHA regulations.

C. OSHA Training see Article 24B

## ARTICLE 10 - Pickets, Banners, Strikes, Lockouts, and Work Interference

A. It shall not be a violation of this Agreement for any employee to refuse to work on a job where to do so would require them to cross a picket line of a striking Union.

B. The Union and the Employer agree that there shall be no strike or other concerted interference with the Employer's business, and there shall be no lockout during the existence of this Agreement for any reason whatsoever, with the exception of delinquent wages or fringe benefit contributions.

C. Slowdowns, forcing of overtime, spread work tactics, standby crews and feather-bedding practices have been and are condemned.

## ARTICLE 11 - Subcontractor Clause

### WORK PRESERVATION

To protect and preserve, for the employees and their Employers covered by this Agreement, work traditionally having been performed by the Employers and assigned to employees under this Agreement or its predecessor Agreements, and to prevent intentional interference with the protection and preservation of such work, it is agreed as follows:

### SUBCONTRACTING

There are four (4) different districts relating to subcontracting, basically along county lines; however where cities or towns fall on boundary lines, the city limits or towns are referenced separately at the end of the article under the heading "Cities and Towns on Boundary lines", and are covered by the subcontracting language applicable to those areas.

## SUBCONTRACTING LANGUAGE FOR DISTRICT 1 ONLY

With regard to work traditionally having been performed by the Employers and assigned to employees under this Agreement or its predecessor Agreements on the job site, if the Employer subcontracts such work to a subcontractor, the Employer shall require that such subcontractor be signatory to a current collective bargaining agreement with the Union covering such work.

This provision shall be enforceable through Article 7, Settlement of Disputes. In addition to any amount payable to the joint Employer/Union Trust Funds covering pensions, health and welfare and vacation, and/or the Joint Apprenticeship Program, an arbitrator enforcing this Agreement shall have authority to award other damages to be payable to one or more of the above Employer/Union Trust Funds.

The above language pertains to District 1 only, which shall consist of Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Kanabec, Pine, Ramsey, Scott, Sherburne (excluding the area surrounding the City of St. Cloud and extending 20 miles beyond the city limits in Sherburne County), Washington and Wright counties, and the city limits of Red Wing and extending 20 miles beyond the city limits in Goodhue County in Minnesota and the territory in Wisconsin described in Article 4 of this contract. (See "Cities or Towns on Boundary lines").

## SUBCONTRACTING LANGUAGE FOR DISTRICT 2 ONLY

If the Employer subcontracts carpentry work to be performed at the job site, the Employer shall require the subcontractor to sign a Subcontract Agreement containing the following provision:

> "The subcontractor agrees to comply with the provision relating to wages, fringe benefits, premium pay and on-the-job working conditions in the current collective bargaining agreement entered into between the CCA/MDPA and the North Central States Regional Council of Carpenters for the duration of the Employer's project."

The Employer shall require the subcontractor to sign a Subcontract Agreement containing the foregoing provision only when performing carpentry work on the project, and when the subcontractor does not represent to the Employer that they have an established building trade's collective bargaining agreement covering the affected classification of work.

The above language pertains to District 2 only, which shall consist of Meeker, McLeod, LeSueur, Rice, Goodhue (Note: See Red Wing exclusion in cities or towns on county lines). Wabasha, Blue Earth, Waseca, Steele, Dodge, Olmsted, Winona, Faribault, Freeborn, Mower, Fillmore, Houston and the portions of Sibley and Nicollet counties east of the following roads, starting at Highway 22 on the northern Sibley County line and proceeding south to the town of New Sweden in Nicollet county, and then continuing south on Highway 111 to the town of Nicollet and then continuing south on #23 to the south line of Nicollet County. Note: Extending 5 miles beyond the town or city limits of New Auburn, Gaylord, New Sweden and Nicollet shall be in Subcontracting District 4. (See "Cities or Towns on Boundary lines").

## SUBCONTRACTING LANGUAGE FOR DISTRICT 3 ONLY

1)  If the Employer subcontracts bargaining unit work, the Employer will subcontract such work only to another Employer, which has a current collective bargaining agreement with this Union covering such bargaining unit work.

2)  Where the Employer is competing against non-union prime contractors, or where Union subcontractors are not available, or where the project owner designates certain non-union

subcontractors to be used on the project, the contractor shall notify the Union who the non-signatory contractor is and provide the total wage package to be paid to employees of this subcontractor in writing, in a timely manner.

3) It is agreed that not more than one (1) non-signatory subcontractor, limited to one phase (i.e. drywall/steel framing, wood framing, roofing, etc.) of bargaining unit work on a job site shall be utilized, as specified in Paragraph 2 above. All others shall comply with paragraph 1 of this subcontractor clause.

If the Employer is unable to comply with this Section (3) due to availability of signatory contractors, it is agreed that the Union and the Employer will convene to resolve the problem.

The above language pertains to District 3 only, which consists of Benton, Mille Lacs, Morrison, Stearns counties and the area surrounding the City of St. Cloud and extending 20 miles beyond the city limits in Sherburne County). (See "Cities or Towns on Boundary lines.")

## SUBCONTRACTING LANGUAGE FOR DISTRICT 4 ONLY
The parties agree to not subcontract any work that the contractor normally performs in order to avoid the terms and conditions of this Agreement. They also agree that it is mutually desirable to have work performed by subcontractors working for the contractor who is a party to the Agreement, subject to the terms of this Agreement, and the contractor will, in letting subcontracts, endeavor to obtain this objective.

The above language pertains to District 4 only, which consists of Traverse, Grant, Douglas, Todd, Big Stone, Stevens, Pope, Lac Qui Parle, Swift, Chippewa Kandiyohi, Yellow Medicine, Renville, Lincoln, Lyon, Redwood, Brown, Pipestone, Murray , Cottonwood, Watonwan, Rock, Nobles, Jackson and Martin counties, and the portions of Sibley and Nicollet counties west of the following roads starting at Highway 22 on the northern Sibley County line and proceeding south to the town of New Sweden in Nicollet County, and then continuing south on Highway 111 to the town of Nicollet, and then continuing south on #23 to the south line of Nicollet County. Note: Extending 5 miles beyond the town or city limits of New Auburn, Gaylord, New Sweden And Nicollet shall be in Subcontracting District 4. (See "Cities or Towns on Boundary lines.")

## CITIES OR TOWNS ON BOUNDARY LINES
Each city or town listed below falls on or adjacent to Boundary lines where there would normally be a change in subcontract language.

There will be one subcontract district as shown below for each city or town, which will extend 20 miles beyond the city limits or town boundary.

| | |
|---|---|
| Belle Plaine | District 1 – Carver, Scott and Sibley counties |
| Princeton | District 1 – Sherburne and Mille Lacs counties |
| Red Wing | District 1 – Goodhue County |
| Lake City | District 2 – Goodhue and Wabasha counties |
| Bellechester | District 2 – Goodhue and Wabasha counties |
| New Prague | District 2 – Scott and LeSueur counties |
| St. Cloud | District 3 – Sherburne, Benton and Stearns counties |
| Motley | District 3 – Morrison, Todd and Cass counties |
| Eden Valley | District 3 – Meeker and Stearns counties |
| Brooten | District 4 – Pope and Stearns counties |

There will be one subcontract district as shown below for each city or town, which will extend 5 miles beyond the city limits or town boundary.

New Auburn* & Gaylord*   District 4 – Sibley County
New Sweden* & Nicollet*   District 4 – Nicollet County

## ARTICLE 12 – Union Representatives and Stewards

A. At all times, authorized representatives of the Union shall have the right to visit the jobs, but shall first contact whoever is in charge of the job. In the event neither is available, said representatives shall leave their business card in the job office before contacting employees. Said representatives shall not hinder or interfere with the progress of the job. It shall be the absolute obligation of the Union Representative to adhere to all pertinent safety rules of the particular job.

B. The Union Business Representative shall have the right to designate a steward from among the employees on the job, and shall notify the Employer or their representative on the job, in writing, of the designated steward.

C. The Steward shall not be docked for time spent in giving assistance to injured workers, or in caring for the worker's tools or clothing.

D. The Steward shall not be discharged, transferred, nor discriminated against for performing the normal duties of a steward in a reasonable manner.

E. The Steward shall not be terminated, except for justifiable cause, until a hearing has been held before a committee composed of a representative from the Union, and a representative from the Employer. Such hearing will be held within three (3) working days of said notice.

## ARTICLE 13 – Payroll Records

In case of a dispute arising over hours and wages, the Union shall have the right to examine the payroll records of the employee covered by this Agreement, upon which there is a dispute. Prior to the actual examination, a written request shall be submitted to the Employer involved.

## ARTICLE 14 – Pay Day, Wage Payment and Call In Pay

A. It is agreed that all employees shall be paid weekly and no more than seven (7) days held back including payday.

B. Wages shall be paid at or before the end of the shift of the designated payday. Employers may utilize alternative forms of paycheck distribution, such as mailing of paychecks or by direct deposit. If paychecks are mailed, they shall be mailed at least one (1) day prior to the Employer's designated payday based on the envelope's postmark to be considered timely. A two (2) hour penalty may be imposed for any violation of the above.

C. An employee who is laid off or discharged shall receive all monies due in cash or negotiated check at time of layoff, or the employee's check shall be immediately mailed to the employee's last known address on the next working day. If the Employer does not mail the employee's paycheck as provided by the envelope's postmark, a two (2) hour penalty shall be added for each working day until mailed to employee's last known address.

D. Employees who quit will be paid any wages due them at the next regular payday.

E.   The Employer agrees to provide the following information on the employee's check stub: Hours, date, regular pay, overtime pay, gross pay, deductions, and net pay. This information and all other payroll and employment records shall be retained by the Employer for a period of not less than six (6) years.

F.   The employee shall be given one (1) hours' notice prior to layoff, e.g., all employees to be notified by 11:00 a.m. when they are to be laid off at noon. In the event the Employer fails to notify the employee, a penalty of one (1) hour of pay at the straight time rate shall be paid to the employee.

G.   If an employee reports to work and is not put to work, the employee shall receive two (2) hours of pay. The employee must remain on the job site in order to receive this two (2) hours pay.

H.   When an employee has been engaged by the Employer, either directly or by a referral request made by the Employer, and is refused employment when arriving at work with their tools, the employee shall be paid four (4) hours time, provided they arrive within a reasonable period of time, not to exceed four (4) hours provided such refusal of employment is not due to conditions beyond the control of the Employer.

I.   These provisions, however, are not to be effective when work is unable to proceed because: (1) railroads or common carriers fail to make deliveries as schedules; (2) the Engineer or Architect refuses to permit work; (3) Acts of God, or weather conditions will not permit work.

J.   Any employee who is given a paycheck that is returned by a bank for insufficient funds shall receive an additional four (4) hours pay. Any employee that loses a paycheck shall be responsible for stop payment charges. If a check is mailed, the employee must promptly notify the Employer within three (3) days if the check is not received; if notice is not given, the employee shall be responsible for the stop payment charge.

K.   In the event that the Employer deliberately violates the provisions of the foregoing Articles or deliberately violates any provisions of this Agreement relating to wages, hours of work, overtime differentials and vacations, any back pay owed to the employee because of such violations shall be paid by the Employer at the rate of two times the standard straight time and overtime rate. Reasonable evidence of clerical error or honest mistake in interpretation of this Agreement shall exempt the Employer from the double penalty provisions, and in such case the Employer shall be required to pay only the actual amount of back pay involved, at the standard straight time and overtime rate.

L.   Insurance and Taxes. The Employer shall carry Worker's Compensation Insurance, Social Security and Unemployment Insurance on all employees covered by this Agreement. Where work is performed under circumstances that the provisions of the Minnesota Unemployment Compensation Law are not applicable, the Employer agrees to elect to be covered pursuant to Minnesota Statutes, Section 268.042, Subdivision 3.

## ARTICLE 15 – Fringe Benefits

The Employer agrees to contribute every month, not later than the 15th of the following month, such sums for Pension, Health and Welfare, Vacation, Delta Dental, Apprenticeship and Promotion Funds (the "Fringe Benefit Funds") as they may be established, an amount for each hour worked by all employees covered by this Agreement. Each payment shall be accompanied by a report in a form as specified by the Trustees. The Funds' Trustees shall equally represent the Union and the Employer. The terms of the Trust Agreement establishing those Funds are hereby incorporated as a part hereof.

A. All Employers, upon becoming bound to this Agreement after May 1, 2010, shall obtain a $50,000 surety bond to be held by the Trustees of the Fringe Benefit Funds. In the event that the Employer cannot or does not secure a $50,000 bond, the Employer must pay fringe benefits on a weekly basis at the same time as the Employer's regular payroll disbursements. "Weekly basis" shall mean that the Employer's report and payment for a particular work week shall be due on the Friday of the following week. An Employer's report and payment shall be considered "delinquent" if not postmarked on or before such day. In addition to the weekly Fringe Benefit contributions, the unbonded employers and delinquent employers must also pay into an escrow account held by the Fringe Benefit Fund Trustees or their designee(s) an amount equal to 20% of the Employer's weekly fringe benefit payment. The unbonded/delinquent Employer shall continue to make weekly payments to the escrow account until the balance of the escrow account reaches $50,000 ($25,000 if the Employer has fewer than seven (7) regular employees). An Employer may cash out its escrow account only if the Employer has provided proof to the Trustees or their designee(s) that the Employer has obtained a $50,000 surety bond to be held by the Trustees of the Fringe Benefit Funds.

B. An Employer shall be considered "delinquent" for a particular work month (or work week in the case of Employers on weekly reporting under (c) below) if its required report and the proper payment for that month (week) are not postmarked on or before the 15th day of the following month (Friday of the following week, for Employers required to make payments on a weekly basis), irrespective of whether such delinquency is willful or otherwise.

C. Contributions which are delinquent as defined in (D) above shall be deemed to be "unpaid contributions" for purposes of the Funds' remedies pursuant to this Agreement and applicable law.

D. An Employer who is delinquent and has unpaid contributions shall be required to pay to the Funds an additional amount of 10% of the amount of the unpaid contributions as liquidated damages together with interest on the unpaid contributions as specified in the Trust Agreement, or if greater, two times the specified interest on the unpaid contributions.

E. When the Trustees have determined that an Employer is delinquent in its Fringe Benefit contributions, the Employer shall make ongoing and future Fringe Benefit contributions on a weekly basis and establish an escrow account as described in paragraphs (B) and (C) above. Once the Employer has made payments on a weekly basis for 26 consecutive weeks without further delinquency, the Trustees may, in their sole discretion, remove the requirement that such delinquent Employer make weekly fringe fund reports and payments and contributions to the escrow account. The Trustees may, in their sole discretion, permit such delinquent Employer to cash out its escrow account only after the Employer has made Fringe Benefit contributions for one year without delinquency and provided proof of a surety bond as described in paragraph (A).

F. Illustration: If an Employer's report and payment for the January work month have not been postmarked before February 16, such Employer becomes delinquent at that point and must pay the full amount due, plus interest and 10% as liquidated damages or, if greater, double interest. In addition, the Employer shall be placed on the weekly reporting basis for work weeks commencing after February 16. Reports and payments shall then be due each week on the Friday of the week following the work week, and weekly payments shall be made to an escrow account in an amount equal to 20% of the weekly contributions due. When the Employer has completed 26 consecutive weeks without further delinquency, the Trustees of the Fringe Benefit Funds may (in their discretion) allow the Employer to revert to monthly Fringe Benefit contributions.

When the Employer has completed one year of required Fringe Benefit payments without further delinquency, and has proven to the Trustees that it has obtained a $50,000 surety bond to be held by the Trustees, the Trustees may (in their discretion) allow the Employer to cash out the escrow account.

G. The delinquent Employer shall also be required to pay all cost of collection actually incurred by the Trust Fund, including all attorney fees, service fees, filing fees, court reporter fees and all other fees, costs and disbursements incurred by or on behalf of the Trust Funds in collecting the amount due.

H. Each Employer who is required to make payments to the Trust Funds shall promptly furnish to the Trustees or their authorized agents, on demand, all necessary employment and payroll records, and any other relevant information relating to its employees covered by this Agreement for examination, whenever such examination is deemed necessary in connection with the proper administration of the Trust Funds. The Trust Funds may, during the course of an audit, require that the Employer produce vendor information, material invoices, and information relating to other disbursements. Trust Fund auditors may require access to the Employer's electronic records relating to any information sought during an audit. If any Employer fails or refuses to furnish its payroll records to the Trustees or their authorized agents upon demand or refuses to afford the Trustees, or their authorized agents reasonable opportunity to examine the same in accordance with standard auditing procedures, the Trustees may enforce such right by legal action in which event all attorney fees, service fees, filing fees, court reporter fees, and other legal costs and disbursements, as well as the auditing fees and costs incurred in conducting such audit, shall be paid by such Employer on direction of the Trustees.

I. The Unions shall also have the right to take economic action, including but not limited to the right to refuse to supply personnel, to enforce the rights enumerated in this Article on behalf of the Unions and the Trustees. The parties to this Agreement acknowledge that the provisions of this Agreement establishing rates of pay, wages, all hours of employment and other terms and conditions of employment, including fringe benefits, apply to employees employed in job classifications under this contract.

J. The parties to this Agreement, and all Employers covered thereby, agree to be bound by all the terms of the respective Trust Agreements governing the establishment, administration, and operation of the Funds in accordance with the Trust Agreements. The employers and the Union hereby ratify all of the actions already taken or to be taken by such Trustees within the Scope of this authority provided that action is within the scope of the Trustees' authority and not in conflict with this agreement.

K. **National or State Health Insurance.** In the event that health care reform enacted in 2010 under Public Law 111-148 (the Patient Protection and Affordable Care Act) and Public Law 111-152 (the Health Care and Education Reconciliation Act of 2010), or any subsequent health care reform enacted by Congress or by the legislature of a state in the jurisdiction of this Agreement, affects the amount of necessary contributions to the North Central States Regional Council of Carpenters Health Fund, this Agreement shall be open for the sole and exclusive purpose of apportioning the amount of the then-current hourly contribution required by this Article among North Central States Regional Council of Carpenters Health Fund, wages, and any payments required under such health care reform legislation. The reapportionment shall be made in accordance with agreement reached between the Trustees of said Fund and the negotiating committees of the Carpentry Contractors Association, the Minnesota Drywall & Plaster Association, and the North Central States Regional Council of Carpenters.

L. **Pension Rehabilitation Plan.** The actuary for the Twin City Carpenters and Joiners Pension Fund (the Plan) has certified that the Plan, for the Plan year beginning January 1,

2010, is in critical status as that term is defined in the Pension Protection Act of 2006. As a result of the Plan being so certified, the Trustees of the Plan are required to adopt and the parties to this Agreement are required to implement a Rehabilitation Plan. The Trustees have adopted a Rehabilitation Plan, dated April 9, 2010, and have communicated it to the bargaining parties, by notice dated April 30, 2010. The Rehabilitation Plan is hereby incorporated into this Agreement by this reference. The parties hereby implement the Rehabilitation Plan and authorize and direct the Trustees to take any and all actions permitted or required by the Rehabilitation Plan or which they find reasonable and appropriate in achieving the objectives of the Rehabilitation Plan as required by law.

## ARTICLE 16 – Savings Clause

This Agreement is intended to be in conformity with all applicable and valid State or Federal Laws, rules and regulations. Any conflict between the provisions of this Agreement and the terms of any such laws and regulations shall cause the provisions of this Agreement so in conflict, to be superseded or annulled; but shall not supersede or annul the terms and provisions of this Agreement which are not so in conflict.

## ARTICLE 17 – Duration Dates

A.   This Agreement shall remain in full force and effect through April 30, 2013. All terms of this Agreement shall take effect May 1, 2010.
B.   Any party has the right to terminate or amend this Agreement by giving notice to the other party sixty (60) days before the expiration date of this Agreement. Failure to give such notice shall cause this Agreement to be renewed automatically for a further period of twelve (12) months.
C.   In the event such written notice is given, and a new Agreement is not signed before the expiration date of this Agreement, then this Agreement shall continue in force until a new Agreement is signed or negotiations are formally broken off, or until a Strike or Lockout occurs.

## ARTICLE 18 - Wages

(For boundaries refer to Article 4, Territorial Jurisdiction, and Wage map)

A.   The minimum scale of wages to be paid to Journeyman Carpenters and Pile Drivers working within the territorial jurisdiction described in Article 4 for residential and commercial construction shall be as follows.
B.   Foreman: Where job conditions require an employee covered by this Agreement to exercise responsible control and direction over other employees covered by this Agreement, that employee shall receive Foreman pay. The minimum scale for Foreman shall be $1.75 above Journeyman scale of wages.
C.   Where materials are brush coated or pressure treated with toxic carbolineum or toxic creosote prior to installation or handling, all employees actually engaged in brush coating, installing or handling such materials shall be paid an additional twenty-five cents ($.25) per hour. Installation shall include the framing, boring and bolting up of materials. The above does not apply to demolition or removal of material, regardless of whether such material had ever been brush coated or pressure treated with toxic carbolineum or toxic creosote.

D. Work performed in boatswain's chair, on swing stage, tunnel work (defined as being underground, part of a building and not openly excavated) scaffold over fifty (50) feet in height, but excluding one (1) and two (2) family dwellings shall receive an additional twenty-five cents ($.25) per hour.

E. Whenever provision is made under this Article for payment of rates of pay in excess of the minimum set forth in the first paragraph, such rates shall only be paid for the time during which the employees are actually engaged in the work for which such higher rate is established. This shall include the foreman.

## COMMERCIAL CONSTRUCTION DEFINITION

Any construction not covered by the definition of residential construction. Regardless of intended use or size, any new construction, above grade, using poured in place concrete, pre-stressed or pre-cast concrete, or block and/or brick structures, shall be deemed to be commercial construction.

Conversely, any commercial buildings or mixed occupancy of residential and commercial buildings as defined above or family dwellings over five (5) stories high shall receive the current applicable commercial wage rate.

## COMMERCIAL RATES

| | **AREA A1**<br>Taxable<br>Base Wage | Metro<br><br>Vac. (3% of Gross) | Dues | Educ. | H&W | DB<br>Pen. | DC<br>Pen. | Appr.<br>Fund | Total Industry |
|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $31.79 | 1.05 | 3% | .10 | 5.63 | 9.45 | .69 | .38 | 47.94 .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 47.94 |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 49.14 |

**AREA A-2** Meeker and McLeod counties and the City of Red Wing, extending 5 miles outward.

| | Taxable Base Wage | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $26.81 | 1.05 | 3% | .10 | 5.63 | 9.45 | .70 | .38 | 42.97 .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 42.97 |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 44.17 |

**AREA B-1** Olmsted, Goodhue (See A-2 for the City of Red Wing), Wabasha, Dodge, Fillmore, Houston and Winona Counties                                                                 CPI

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $25.70 | 1.00 | 3% | .05 | 5.63 | 8.60 | .45 | .38 .10 | 40.86 .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 40.86 |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 42.06 |

**AREA C-1 NORTH** Benton, Mille Lacs, Morrison and Stearns Counties and the city limits of St. Cloud and extending 5 miles outward beyond the city limits in Sherburne County.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $23.08 | 1.00 | 3% | .05 | 5.63 | 8.95 | .70 | .38 | 38.74 .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 38.74 |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 39.94 |

## AREA C-2 NORTH
Traverse, Grant, Douglas, Todd, Big Stone, Stevens, Pope, Lac Qui Parle, Swift, Chippewa, Kandiyohi, Yellow Medicine & Renville counties.

| | Taxable Base Wage | Dues Vac. (3% of Gross) | | Educ. | H&W | DB Pen. | DC Pen. | Appr. Fund | Total | Industry |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $19.72 | .50 | 3% | .05 | 5.63 | 7.61 | .60 | .38 | 33.94 | .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 33.94 | |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 35.14 | |

## AREA C-1 SOUTH
LeSueur, Rice, Blue Earth, Waseca, Steele, Faribault, Freeborn, Mower and the eastern portion of Sibley and Nicollet counties

### OVER 1,000,000 (1 mill)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $23.27 | .71 | 3% | .05 | 5.63 | 9.01 | .10 | .38 | 38.39 | .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 38.39 | |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 39.59 | |

### UNDER 1,000,000 (1 mill)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $21.82 | .16 | 3% | .05 | 5.63 | 8.51 | .10 | .38 | 36.44 | .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 36.44 | |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 37.64 | |

## AREA C-2 SOUTH
Lincoln, Lyon, Redwood, Brown, Pipestone, Murray, Cottonwood, Watonwan, Rock, Nobles, Jackson, Martin and the western portion of Sibley and Nicollet counties.

### OVER 1,000,000 (1 mill)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $19.11 | .25 | 3% | .05 | 5.63 | 7.62 | .10 | .38 | 32.84 | .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 32.84 | |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 34.04 | |

### UNDER 1,000,000 (1 mill)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $17.71 | .00 | 3% | .05 | 5.63 | 6.87 | .10 | .38 | 30.69 | .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 30.69 | |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 31.89 | |

## RESIDENTIAL CONSTRUCTION DEFINITION
Any work above grade involved in the erection, remodeling or finishing of a wood frame structure, up to four (4) levels, that is intended for use as a residence or residences or as an appurtenance. Any portion of work included and done in conjunction with the residential portion of the base building (i.e. garage, community/party room, manager's office, lobby, laundry area, etc.). This excludes interior tenant build-out of a commercial/retail space. Any portion of work in a building five (5) stories or less in total height intended for use as a residence or residences regardless of intended use of other portions of the building shall be deemed to be residential construction. (Note: includes wood framed licensed nursing homes, convalescent facilities and motels) The remodeling of any structure four (4) stories or less in total height regardless of structural materials shall be deemed residential construction provided intended use is for a residence or residences.

## RESIDENTIAL CONSTRUCTION WAGE RATE FOR JOURNEYMEN
## IN AREAS A-1 AND A-2 ONLY (See WAGE Map)
## RESIDENTIAL CONSTRUCTION
AREAS A-1 and A-2

| | Taxable Base Wage | Dues Vac. (3% of Gross) | | Educ. | H&W | DB Pen. | DC Pen. | Appr. Fund | Total Industry |
|---|---|---|---|---|---|---|---|---|---|
| 5/1/10 | $27.63 | 1.05 | 3% | .10 | 5.63 | 8.35 | .62 | .38 | 42.61 .02/.04 |
| 5/1/11 | $0.00 Package Increase | | | | TBD | | | | 42.61 |
| 5/1/12 | $1.20 Package Increase | | | | TBD | | | | 43.81 |

## RESIDENTIAL RATES - WAGE AREAS B-1, C-1 AND C-2

Residential rates for Journeymen in all other wage areas shall be $2.00 less than commercial base wages, plus full fringes in each area. (NOTE: In Areas C-1 and C-2 South it will be $2.00 less than the "Over 1 million base rate").

SCHEDULE A – Residential and Commercial Apprentice rates are calculated according to the formula set forth below which is calculated based on the applicable journeyman rate of the area in which the apprentice is working. Commercial Apprentice rates for the A-1 Metro area shall be as follows:

**EFFECTIVE MAY 1, 2010**

| AREA A-1 ONLY | Classification | % | Base | Ed./ Trng. | Vac | Dues | Health | DB Pens. | DC Pens. | App./ Ed. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Journeyperson | 100% | $31.79 | -0.10 | -1.05 | -3% | $5.63 | $9.45 | $0.69 | $0.38 | $47.94 |
| | Apprentice 6501-7000 | 95% | $29.95 | -0.10 | -0.25 | -3% | $5.63 | $1.90 | $0.25 | $0.38 | $38.11 |
| | 6001-6500 | 90% | $28.36 | -0.10 | -0.25 | -3% | $5.63 | $1.90 | $0.25 | $0.38 | $36.52 |
| Pre-Apprentice | 5001-6000 | 85% | $26.77 | -0.10 | -0.25 | -3% | $5.63 | $1.90 | $0.25 | $0.38 | $34.93 |
| 6001+ | 4001-5000 | 80% | $25.18 | -0.10 | -0.25 | -3% | $5.63 | $1.90 | $0.25 | $0.38 | $33.34 |
| 5001-6000 | 3001-4000 | 75% | $23.59 | -0.10 | -0.25 | -3% | $5.63 | $1.50 | $0.25 | $0.38 | $31.35 |
| 4001-5000 | 2001-3000 | 70% | $22.00 | -0.10 | -0.25 | -3% | $5.63 | $1.50 | $0.25 | $0.38 | $29.76 |
| 3001-4000 | 1501-2000 | 65% | $20.41 | -0.10 | -0.25 | -3% | $5.63 | $1.50 | $0.25 | $0.38 | $28.17 |
| 2001-3000 | 1001-1500 | 60% | $18.82 | -0.10 | -0.25 | -3% | $5.63 | $1.50 | $0.25 | $0.38 | $26.58 |
| 1001-2000 | 501-1000 | 55% | $17.23 | -0.10 | -0.25 | -3% | $5.63 | $1.50 | $0.25 | $0.38 | $24.99 |
| 0-1000 | 0-500 | 50% | $15.65 | -0.10 | -0.25 | -3% | $5.63 | $1.50 | $0.25 | $0.38 | $23.41 |
| | Residential Helper* | 40% | $12.72 | -0.10 | - | -3% | $5.63 | - | - | $0.38 | $18.73 |

*A helper can work a total of 2,000 hours, at which point the employer must classify the helper as a pre-apprentice or apprentice or cease to employ him. The Residential Helpers classification is only available on residential projects.

*Helpers are limited to the following ratio: One helper per each indentured apprentice. One apprentice to one journeyman and one apprentice to three journeymen thereafter.

**Apprentice Wage Formula:**

The above fringes are effective June 1, 2010.

Effective June 21, 2010: Apprentice Taxable Gross = (Journeyman Taxable Gross) X (Apprentice %) – Apprentice DC Pension Contribution

Effective May 1, 2011: Apprentice Taxable Gross = (Journeyman Taxable Gross) X (Apprentice %)

Apprentice Fringe Contributions as shown in table above. Apprentice DB contributions are as follows:

   2010 – $1.50 through 75% level; $1.90 at 80% level and higher

   2011 – $2.00 DB Pension Contribution at all Pre-Apprentice and Apprentice Levels

   2012 – $2.50 DB Pension Contribution at all Pre-Apprentice and Apprentice Levels

Effective May 1, 2010, the sum of five cents ($0.05) per hour is allocated as a contribution to a Plan, administered in accordance with Article 15, hereby established for the purpose of defraying the expenses of apprentices who are separated from employment to attend weeklong apprenticeship school, such contribution shall be remitted to the Plan as established.

All new Apprentices shall be registered through the Apprenticeship Office. If not registered, that worker will be considered a Journeyman. All Apprentices shall be governed by the provisions of the Carpenters Joint Apprenticeship Standards as adopted for this Agreement.

HUD Exception: Employers employed on a HUD project may utilize 2 Apprentices to 1 Journeyman, except that at least 1 Apprentice must have over 4,000 hours.

### INTERIM JOURNEYPERSONS

Individuals, hired by an employer, who have not previously been classified in the Union membership processing system and not placed in any apprentice classification be hired as an Interim Journeyperson. Interim Journeypersons shall be paid at 80% of the journeyperson total taxable wage rate and 80% of any pension contributions plus all other non-taxable fringe benefit contributions in full for a period of 1000 hours at which time they shall be paid at 90% of the Journeyperson total taxable wage rate and 90% of any pension contributions plus all other non-taxable fringe benefits contributions in full for the next 1000 hours. Interim Journeypersons must complete a minimum 50 hours of training, as sponsored by the Joint Training Committee, to include OSHA training and Orientation. After the 2000 working hours and completion of a minimum 50 hours of training the Interim Journeyperson shall be a Journeyperson. The training curriculum, except as specified here, is to be determined by the Training Program with Employer input and agreed to by the Employee. Employees shall be credited cumulatively for all hours worked under multiple employers as an Interim Journeyperson, such hour totals to be verified by the fringe fund reports. An Employer may increase the Interim Journeyperson's rate to the regular rate prior to the 2000 hours. All Interim Journeypersons must be registered with the Union prior to starting work. The ratio of Interim Journeypersons to Journeypersons shall not be greater than 1 to 10 on a company wide basis. A company with less than 10 Journeypersons is allowed 1 Interim Journeyperson if they have at least 4 Journeypersons. Interim Journeypersons must be paid regular Journeyman scale on prevailing wage work.

**Interim Journeyperson Wage Rates effective May 1, 2010:** (For rates effective May 1, 2011 and May 1, 2012 and for wage areas outside of the metro, refer to wage schedules mailed to contractors and available at the Regional Council office and at www.northcountrycarpenter.org)

| | % | Taxable Base Wage | Dues Vac. (3% Gross) | Educ. | H&W | DB Pen | DC Pen | Appr Trng | Total Industry |
|---|---|---|---|---|---|---|---|---|---|
| **A-1 Metro** | | | | | | | | | |
| 0 – 1000 | 80% | $25.43 1.05 | 3% | .10 | 5.63 | 7.56 | .55 | .38 | $39.55 .02/.04 |
| 1000 – 2000 | 90% | $28.61 1.05 | 3% | .10 | 5.63 | 8.51 | .62 | .38 | $43.75 .02/.04 |
| **A1 & A2 Residential** | | | | | | | | | |
| 0 – 1000 | 80% | $22.10 1.05 | 3% | .10 | 5.63 | 6.68 | .50 | .38 | $35.29 .02/.04 |
| 1000 – 2000 | 90% | $24.88 1.05 | 3% | .10 | 5.63 | 7.52 | .56 | .38 | $38.97 .02/.04 |

## ARTICLE 19 – Travel Outside District – Area A1 Only

It is agreed that when employees covered by this Agreement are hired in Area A-1 and then directed by their Employer to work outside the territorial jurisdiction of Area A-1 in this Agreement, and 65 miles or more from their home or record, traveling time to and from the job shall be paid. In addition, they shall be paid a travel allowance from their home of record to the job and return for each day worked. The travel allowance shall apply only to the driver and not to passengers.

When said employees are directed by their Employer to remain away from home overnight, board and lodging shall be paid for each day so directed and no mileage shall be paid for that day. They shall be paid not less than the scale of wages, including fringe fund contributions, provided for in this Agreement, and if the scale of wages is higher where such work is performed than provided for in this Agreement, such higher prevailing rate shall be paid.

Travel Allowance                          Board & Lodging
$.28 per mile                             $30.00 per day

Due to recessionary construction industry conditions, the Parties agree that Article 19 Travel shall be suspended commencing on the effective date of this Agreement. Article 19 Travel shall be automatically restored in its entirety for jobs bid on or after May 1 of the year following the end of a calendar year in which hourly Pension Fund contributions meet or exceed 11 million hours.

## ARTICLE 20 - Parking

Effective May 1, 2002 the Employer shall reimburse employees to a maximum of five (5) dollars per day for parking in downtown Minneapolis/St. Paul when provided with receipt by the employee. The Employer has the option of providing parking or shuttle service.

Due to recessionary construction industry conditions, the Parties agree that Article 20 Parking shall be suspended commencing on the effective date of this Agreement. Article 20 Parking shall be automatically restored in its entirety for jobs bid on or after May 1 of the year following the end of a calendar year in which hourly Pension Fund contributions meet or exceed 11 million hours.

## ARTICLE 21 – Work Break

Coffee break shall be ten (10) minutes in the forenoon and ten (10) minutes in the afternoon. The coffee shall be taken from the employee's own container, which will be restricted to close proximity to the employee's place of work on the job site.

## ARTICLE 22 - Hours

A.    The standard work day shall consist of eight (8) hours between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday, except by mutual agreement between the Employer and the Regional Council the hours may be adjusted up to two (2) hours earlier to promote the efficiency of the job. The standard workweek shall consist of forty (40) hours in any one (1) week, Monday through Friday.

B.    Overtime worked between the hours of 8:00 a.m. Monday and to midnight Saturday shall be at the rate of time and one-half (1-1/2). All work done between Saturday midnight and the regular starting time on Monday, shall be at the rate of double time (2T), with the exception of shift work, and where earlier starting hour is permitted. It shall be understood there shall be no pyramiding of overtime.

C.    No Carpenter or Piledriver shall work on the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day or Christmas Day, unless in case of necessity for which double time shall be paid. When any of the above holidays to be observed occurs on Saturday, then the preceding Friday shall be observed as such. If it occurs on Sunday, then the following Monday shall be celebrated as such by employees covered under this contract.

D. **FOUR-TEN WORK WEEK EXCEPTION**
**AREAS B-1 AND C-1 ONLY**

Four-Tens: During the term of this Agreement, an Employer may establish a scheduled four (4) ten (10) hour work days, Monday through Thursday, between the 1st Saturday of April and the last Saturday of October by mutual agreement with the Union. When a scheduled 4-10 hour work week is in use, any hours worked in excess of 10 hours in any one work day or on Friday shall be paid time and one-half (1-1/2). An additional ten (10) minute break shall be observed after the 10th hour, if work is to be continued.

If a holiday recognized by this Agreement falls during a scheduled 4-10 hour work week Friday may be used to facilitate the employee receiving a full 40 hour week. No employee may be penalized for refusal to work Friday under this provision.

**AREA C-2, and McLeod and Meeker Counties**– Four (4) ten (10) hour days, Monday through Thursday in Wage Area C-2 and McLeod and Meeker counties is permitted, with Friday as a make-up day if time is lost due to inclement weather Monday through Thursday of a scheduled four 10 hour work week. If an employee declines to work Friday as a make-up day, that employee shall not be penalized.

E. **RESIDENTIAL CONSTRUCTION WORK ONLY** – If an employee is prevented from working by reason of inclement weather, Saturday or any part thereof may be worked as a make-up day at the straight time hourly rate. All work performed in excess of forty (40) hours, or eight (8) hours in any one day will be paid at time and one-half (1-1/2). If an employee declines to work Saturday as a make-up day, that employee shall not be penalized. Sundays and Holidays may not be used as a make-up day.

F. When conditions make it necessary to work more than one shift, any extra shifts shall be considered night shifts and shall work seven (7) hours and receive eight (8) hours pay. An unpaid rest period of at least one-half (1/2) hour shall be taken in the middle of all shifts; the same employees shall not work on more than one (1) shift; no extra shifts shall be started for less than four (4) days.

G. It is agreed that in situations beyond the control of the Employer, in owner occupied buildings or facilities, the Employer may schedule all work, or portions of work, which start and end outside the normal workday. Provided such work is not part of a regular multiple shift operation, the first eight (8) hours of work is at straight time. In the event such work is required, the Employer will provide the Union with advance notification that work is being performed outside the regular work schedule.

## ARTICLE 23 - Tools

The Employer shall provide a proper storage place for employees to store tools, the Employer shall provide sanitary drinking water and toilets, and an adequately heated area in which the employee may eat lunch. While tools necessary for the job are in the care, custody and control of the Employer, the Employer shall indemnify each employee for tool losses caused by fire, wind, burglary and forcible entry up to the maximum of $600.00. The employee shall provide in writing to the Employer, an inventory of tools, and updated regularly. The Employer shall

furnish all power tools, cords and electrical accessories (to include cordless rechargeable tools). No employee shall be required as a condition of employment to furnish their own truck.

The Employer may establish a system of signing out for tools or equipment that are the property of the Employer and used by the employee. If the tools are not returned, the Employer is allowed to deduct the cost of the missing item from the wages of the employee that has signed out for the tools or piece of equipment. This does not include when tools and equipment are stolen; employees shall report thefts to the Employer immediately. The Employer may only deduct an amount representing the reasonable value of the missing item.

## ARTICLE 24 – Training Fund, Apprenticeship, and Pre-Apprentices

A.  The Employer shall contribute (.33) thirty-three cents per hour for each hour worked to a Training Fund to be known as the Carpenters Apprenticeship and Training Fund under a Trust Agreement, copies of which the Employer will receive and to which the Employer shall be automatically bound. A portion of the per hour contribution shall be contributed to the National UBC Funds.

B.  The parties to this Agreement recognize that OSHA requires that workers are trained in safety matters in order to be employed on work sites and Employers may require such training to be a condition of employment. It is also recognized that the cost of providing this training is the responsibility of the Employer but is also for the benefit of the employee, and therefore time spent in training will not be compensable. This fund and program shall be administered by the Apprenticeship & Training Trust and Committee.

C.  The parties agree to sponsor a "Recruitment Program" which will allow high school students to work on construction sites under supervision of a journeyman according to the guidelines/rules adopted by the Minnesota Department of Children, Families and Learning. The program shall be supervised by the "Joint Apprenticeship Committee."

D.  Apprenticeship
    1.  The employment of apprentices shall be encouraged and promoted, and all employment will be governed by area standards.
    2.  Apprentices shall be indentured under Minnesota law, including mandatory attendance at school and their employment shall be in accordance with the Department of Labor and Industry governing carpenter-apprentices.
    3.  The ratios of journeyworkers to apprentices as set forth in the Apprenticeship Standards are hereby adopted.
    4.  The Employer and the Union agree to use every legal means to keep apprentices steadily employed actually learning the trade. When necessary, apprentices may be transferred from one Employer to another.

F.  Pre-Apprentices
    1.  The established pre-apprenticeship percentage is calculated on the normal hourly base wage rate.
    2.  The ratio of pre-apprentices is one pre-apprentice for each indentured apprentice employed by the Contractor.
    3.  A pre-apprentice will not displace a journeyperson or indentured apprentice.
    4.  Pre-apprentices will not work unsupervised. If legal requirements for a particular job do not allow for wage payments under the pre-apprentice category, then the pre-apprentice category may not be used on that job.
    5.  A pre-apprentice can be placed in any of the percentage tiers of the pay schedule based on his/her experience or qualifications.
    6.  The pre-apprentice may enter the four (4) year apprenticeship program at any time.
    7.  If the pre-apprentice does not enter the apprenticeship program, he/she may advance

according to the wage chart and can be frozen when the eighty percent (80%) wage rate is reached.

## ARTICLE 25 – Work Dues

During the term of this Agreement and in accordance with the terms of an individual and voluntary written authorization for check-off of membership dues in form permitted by the provisions of Section 302(c) of the Labor Management Relations Act of 1947, as amended, the Employer agrees to deduct once each week from the wages of each employee covered by this Agreement, who signs said authorization, a certain amount of money per hour for each hour worked by said employee during the week. The specific amount of money to be deducted shall be determined by the Union, from time to time, in accordance with its constitution and by-laws, and the Union shall notify the Employer in writing, from time to time as changed by the Union, of the specific amount of money to be deducted. The amount deducted shall be payable to the fringe fund administrator on behalf of the North Central States Regional Council of Carpenters, for and on behalf of its affiliated Local Unions, monthly by the fifteenth (15th) day of the month following the month in which the required amount is deducted and such amount shall be remitted in accordance with all of the applicable provisions and requirements of Article 15 above.

## ARTICLE 26 – CCA/MDPA Industry Funds

Those signatory to this Agreement shall contribute either to the Carpentry Contractors Association (CCA) or the Minnesota Drywall & Plaster Association (MDPA) according to the terms of this Article. These funds shall be used to support and promote the respective interests of the Union carpentry and drywall industries. The fund shall also be used for purposes associated with the negotiation and administration of this Agreement, related training programs, and fringe benefit funds.

Employers signatory to this Agreement performing any work other than drywall work agree to contribute two cents (.02) to the CCA Industry Fund.

Employers signatory to this Agreement performing drywall work agree to contribute four cents (.04) to the MDPA Industry Fund. (The Drywall Industry has an additional .02 for a total of .04 in the Industry Fund. This .02 is to promote the drywall industry.) Your fringe fund reporting form will indicate if you pay this additional .02.

The industry fund contributions described herein may be modified by the CCA or MDPA, respectively, at any time during the term of this agreement. If you have questions regarding the Industry Funds, please contact the Association Office at 651/633-6774.

## ARTICLE 27 – Labor Management

The parties agree to establish a labor/management committee consisting of three (3) members appointed by the Association and three (3) members appointed by the Union. The committee will meet monthly to review areas of labor/management cooperation and joint promotion activities.

In addition, by unanimous consent the committee can review the existing Agreement in order to address projects where there is competition from non-signatory Employers. Any administration cost borne by the committee will be paid for by the CCA/MDPA Fund.

A.	The Labor User Contractor Committee Joint Labor-Management Uniform Drug/Alcohol Abuse Program, copies of which are on file with the CCA/MDPA and the North Central States Regional Council of Carpenters, is incorporated herein by reference and is made a part of the collective bargaining agreement between the North Central States Regional Council of Carpenters and the CCA/MDPA currently in effect.

Employers may require drug and alcohol testing of employees and applicants for employment, including random testing, if the Employer has adopted a written drug and alcohol testing policy complying with the provisions of the LUC Program and applicable statutes.

The parties agree to establish provisions to allow the contractors to perform random drug/alcohol testing in accordance with applicable statutes, providing the Lakes and Plains Regional Council has representation in the development of these provisions and is in agreement with the final draft.

B.  **Worker's Compensation Program:**     It is agreed to establish an optional jointly managed Worker's Compensation Program, providing the North Central States Regional Council of Carpenters is in agreement with the final draft of said program, and has representation as a trustee of the same.

The parties agree to enter into an Agreement and Declaration of Trust for the establishment of a Construction Crafts Worker's Compensation Fund (hereinafter the "Fund") to provide Worker's Compensation benefits to eligible employees under this collective bargaining agreement. This Fund will be administered by an equal number of Employer trustees and Union trustees, and will be funded by contributions from Employers on behalf of employees covered by this collective bargaining agreement.

It is the purpose of this Trust Fund to provide employees who claim compensable personal injuries and occupational diseases occurring under Minnesota Worker's Compensation Laws, with benefits required by law. The amount of contributions to this Fund shall be established by the trustees and may be changed from time to time.

C.  **Substance Abuse Testing and Assistance Program:**   The Union and the Employers agree that both parties have an interest in establishing and maintaining a drug-free workplace and resolve to establish a Substance Abuse Testing and Assistance Program ("Program") that is maintained on an industry basis. The parties agree to meet on a labor-management basis to formulate the terms of this program during the period of the agreement. The funding of this program will be through a $.xx per hour contribution into a joint labor-management trust formed for the purpose of administering the program. Copies of the trust agreement will be provided upon request. The funding will begin upon the date May 1st immediately prior to the implementation of the program. (For example, if the program is to be implemented November 2011, then a $.xx contribution will commence May 1, 2011). This is an employer contribution; in the event that the program is terminated, then the contribution will discontinue for the employers. Under no circumstances will this article or any negotiations, signing, or implementation of the program pursuant to this article be considered an opener or re-opener of the Agreement, or subject to any work stoppage.

# ACCEPTANCE OF AGREEMENT

## BETWEEN

## NORTH CENTRAL STATES REGIONAL COUNCIL OF CARPENTERS
and

## CARPENTRY CONTRACTORS ASSOCIATION
and
## MINNESOTA DRYWALL AND PLASTER ASSOCIATION

### ALL WAGE AREAS
2010, 2011, 2012
(Expires April 30, 2013)


CARPENTRY CONTRACTORS
ASSOCIATION AND
MINNESOTA DRYWALL & PLASTER
ASSOCIATION

NORTH CENTRAL STATES
REGIONAL COUNCIL OF
CARPENTERS

William Grimm
Executive Director

James E. Moore
Executive Secretary-Treasurer

July 13, 2010
DATE

July 13, 2010
DATE